Mark B. EVANS, Plaintiff,

v.

The GOLUB CORP. d/b/a Price Chopper Supermarket, Defendant.

No. 96 Civ. 3889 (DC).

United States District Court, S.D. New York.

Dec. 10, 1998.

Mark B. Evans, Wappinger Falls, New York, pro se.

Whiteman Osterman & Hanna by Neil L. Levine, Albany, New York, for defendant.

## OPINION

CHIN, District Judge.

In this employment case, *pro se* plaintiff Mark B. Evans contends that defendant The Golub Corporation d/b/a Price Chopper Supermarket ("Golub") discriminated against him because of his race and color in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e to 2000e–17.

The parties cross-move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, defendant's motion is granted and plaintiff's motion is denied. The amended complaint is dismissed.

## BACKGROUND

### A.  The Facts

Construed in the light most favorable to plaintiff, the facts are as follows:

At the end of April or early May 1993, Golub hired Evans to work in the produce section of its new Short Hills Mall Price Chopper supermarket. Golub employed approximately twenty-five produce clerks, four of whom were African Americans. None of the store's managers or assistant managers were African American. Each clerk was assigned to one of three shifts.

Evans alleges six incidents that he asserts support his claims of disparate treatment and harassment: (1) the produce supervisor, Thomas Hayduk, denied Evans's request to

be transferred from the first shift to the higher paying third shift and wrongfully accused Evans of coercing an employee on the third shift to switch with him; (2) another supervisor, Mark Crispino, cursed at Evans, "using very *demeaning* words," in front of other employees; (3) after Evans informed the store manager of the incident with Crispino, he was dismissed; (4) after he was rehired by the supermarket to work in the bagel section of the bakery department, bakery department assistant manager Steve Lopez spoke to Evans in an inappropriate and confrontational manner; (5) his new supervisor, bakery manager Rick Hunt, "put his hands up to [Evans's] face in *a very threatening* manner" in front of other employees; and (6) Evans was dismissed a second time. (Am. Compl. at 1–3). Hayduk, Crispino, and Hunt are white; Lopez is Latino.

### 1. *The Third Shift Claim*

When plaintiff began his employment in defendant's supermarket, he was assigned to the first shift in the produce department. During his first two weeks in the store, plaintiff had a friendly relationship with his direct supervisor, produce manager Hayduk, and was complimented on his work. (Pl. Dep. Tr. at 44–45, 130–31).

According to plaintiff, a produce clerk who worked the higher paying third shift at night asked Evans if he wanted to switch shifts. (Pl. Mem. at 2). The clerk apparently wanted to move to the earlier shift to accommodate his college schedule. (Pl. Dep. Tr. at 41). Hayduk denied Evans's repeated requests to be transferred to the third shift. (Am. Compl. at 1).

Plaintiff continued his efforts to switch shifts with the college student by approaching the store manager, Rocco LoSavio, Hayduk's superior. (Pl. Mem. at 3). Within a week or two of this request, approximately one month after Evans began his employment with defendant, and after several requests by plaintiff, LoSavio agreed to the switch and plaintiff was transferred to the

third shift. (Pl. Dep. Tr. at 40–42). Hayduk "was unhappy with [LoSavio's] decision to transfer [plaintiff] to the third shift" over his objections. (Hayduk Aff. at ¶ 5; *see* Pl. Dep. Tr. at 46).

### 2. *The Crispino Incident and the First Dismissal*

On one occasion, Hayduk asked plaintiff to go to the back storeroom and retrieve a hand jack with which to move a bin of fruit. (Am. Compl. at 2; Pl. Dep. Tr. at 49). Evans went to the storeroom where he found grocery manager Crispino and seven or eight white employees working. (Pl. Dep. Tr. at 49–50). One of the employees was using the hand jack. (*Id.*). According to plaintiff, in response to Evans's request to borrow the jack and within earshot of the other employees, Crispino fired a stream of coarse expletives at him. (*Id.* at 47). None of the profanity allegedly employed by Crispino, however, made reference to plaintiff's race or color. (*See id.* at 53). Plaintiff has never observed or heard of Crispino arguing with or confronting another employee. (*Id.* at 90).

Plaintiff informed Hayduk of the incident and Hayduk went to speak with Crispino, but Evans could not hear the conversation between the two managers. (*Id.*). Evans claims that he was not convinced that Hayduk would take any action because plaintiff believed Hayduk and Crispino to be friends. (*Id.* at 54–55). Plaintiff therefore informed LoSavio of the incident. (*Id.*). LoSavio accompanied plaintiff to the storeroom where LoSavio spoke to Crispino. (*Id.*). Plaintiff could not hear what was said, but a member of the grocery crew gave Evans the jack. (*Id.*).

The day after the incident with Crispino, Hayduk fired plaintiff for "poor work performance and disruptive behavior."[1] (Hayduk Aff. ¶ 7; *id.* Ex. C; LoSavio Aff. ¶ 6; *see* Am. Compl. at 2). Plaintiff generally disputes that his work performance and behavior were inappropriate. (*See* Pl. Mem. 1–2). Plaintiff does not, however, dispute Hayduk's specific claims that plaintiff took breaks with-

---

1. During plaintiff's deposition, he stated that LoSavio terminated his employment. (Pl. Dep. Tr. at 68–69). Plaintiff was not, however, certain that it was LoSavio. (*Id.* at 68 (responding that he was "not sure" and that "[i]t could have been" LoSavio when asked who fired him)). On the record before the Court, a reasonable jury could only conclude that Hayduk fired plaintiff.

out consulting him, was regularly caught talking to his friends while he was supposed to be working,[2] and became defensive when Hayduk commented on the quality of plaintiff's work. (Hayduk Aff. ¶ 5).

According to plaintiff, on one occasion when "Hayduk tried to discipline [Evans] in [his] work habits," LoSavio told Hayduk "that it was a little too early to be writing [and] evaluating someone." (Pl. Mem. at 1). On two occasions after plaintiff switched to the third shift, however, Hayduk made formal complaints about plaintiff's work.[3] Hayduk also filed a complaint after plaintiff was dismissed for "deliberate restriction of work output."[4] (Hayduk Aff. Ex. C).

Approximately three days after plaintiff was fired, he received a telephone call from George Maxson, defendant's director of human resources, requesting that plaintiff come to the store. (Pl. Dep. Tr. at 65, 70, 73). According to plaintiff, Maxson told him that an employee had come forward supporting plaintiff's version of the Crispino incident, that Crispino had admitted to cursing at plaintiff, and that a report regarding the incident was put in Crispino's employment file. (Id. at 70–72). Maxson offered plaintiff his job back. (Id. at 73). LoSavio then suggested that plaintiff consider taking a position in a new department. (Id. at 73–74). Plaintiff agreed to accept a position in the bakery department working nights. (Id. at 74).

### 3. The Bakery Department Incidents and Final Dismissal

According to plaintiff, two incidents that support his claims of disparate treatment and harassment occurred while he was employed in the bagel section of the bakery department. First, assistant manager Lopez spoke to him in a confrontational manner that plaintiff believes to have been inappropriate. Second, bakery manager Hunt pointed his finger in plaintiff's face while yelling at plaintiff. Plaintiff's employment was terminated soon after the incident with Hunt.

According to plaintiff, one morning he and a white employee were working in the bagel section of the bakery department. Assistant manager Lopez, whom plaintiff had never met, approached them and "started pointing fingers, telling [them what to] do," and "ordering [them] around." (Pl. Dep. Tr. at 127–29; see id. at 78–81). This behavior was directed at both plaintiff and the white employee. (Id. at 129). According to plaintiff, instead of pointing his finger and ordering them around, Lopez should have introduced himself as Hunt's assistant. (Id. at 128–29).

Plaintiff alleges that one morning after the incident with Lopez, bakery manager Hunt approached plaintiff, pointed his finger two inches from plaintiff's face, and said that "there will be no problems in this department like there was [sic] in the other [department]." (Id. at 61; see id. at 60–61, 130; Letter from Evans to the EEOC (July 25, 1995)). Plaintiff believed that Hunt's comment was a reference to the produce department and the Crispino incident. (Pl. Dep. Tr. at 60–61, 130). According to plaintiff, however, LoSavio had told him that the Crispino incident was going to remain confiden-

2. Plaintiff responds to this claim by asking: "Was I supposed to just work [and] not speak with my co-workers, or was I supposed to get permission to speak [with] someone? ?" (Pl. Mem. at 1). Hayduk's affidavit is unclear as to whether the friends plaintiff was "regularly caught talking to" were co-workers as plaintiff seems to assume. (Hayduk Aff. ¶ 5). In the next paragraph of his affidavit, however, Hayduk states that plaintiff was caught outside of the supermarket in the mall's "food court while still on the clock." (Id.).

3. Hayduk attached the warnings as exhibits to his affidavit. On June 4, 1993 Hayduk gave Evans a verbal warning for "inefficiency in the performance of work related duties," including restricted work output and failure to notify Hayduk of when plaintiff was going to lunch and taking breaks. (Hayduk Aff.Ex. A). The future course of action was to be a written warning. (Id.). On June 13, 1993, Hayduk issued a written warning for "negligence in work related duties" due to "a problem with culling and rotation" because Hayduk found bad produce on the tables to which plaintiff was assigned. (Id. Ex. B). The future course of action was to be termination. (Id.).

4. Hayduk wrote in his report that plaintiff "was consistently doing his work at a slower level than his ability" and that he had been "caught talking to his friends in the food court area while still on the clock." (Hayduk Aff.Ex. C).

tial. Responding to Hunt pointing his finger in plaintiff's face, plaintiff pointed his finger at Hunt and asked Hunt if he liked someone pointing his finger in Hunt's face. (*Id.* at 61). Hunt then ordered plaintiff to leave the store. (*Id.*). Plaintiff refused and instead went to wait for LoSavio outside of the store manager's office. (*Id.*). Plaintiff has never observed or heard of Hunt arguing with or confronting another employee. (*Id.* at 90).

During his deposition, plaintiff claimed that he did not recall having a discussion with Hunt that led up to the finger pointing incident. (Pl. Dep. Tr. at 130). Plaintiff does not otherwise dispute, however, Hunt's version of the incident. According to Hunt, on the day of the incident Evans told Hunt that he did not want Lopez to tell him what to do. (Hunt Aff. ¶ 5). Hunt stated that he would speak to Lopez when Lopez arrived at work. (*Id.*). Evans responded "in a threatening manner" by saying: "[D]on't worry about it, me and Steve will talk." (*Id.*). Hunt instructed Evans not to approach Lopez and reiterated that he would speak with the assistant manager. (*Id.*).

Despite Hunt's direct instruction, Evans immediately confronted Lopez when he arrived an hour or two later and began an argument. (*Id.* ¶ 6). Hunt then told Evans that he had a problem with authority and that he was disrupting the workplace, to which Evans responded: "You are nobody. You don't tell me nothing." (*Id.*). At that point Hunt told Evans to leave the store, Evans refused, and insisted on waiting for LoSavio. (*Id.*). Evans also does not contest Hunt's claim that later that afternoon, Evans pointed his finger in Hunt's face, directed a racial epithet at Hunt, and threatened to physically harm Hunt and Lopez. (*See* Hunt Aff. ¶ 7; LoSavio Aff. ¶ 9).

When LoSavio arrived at the store after the incident, both plaintiff and Hunt told LoSavio their versions of what had happened. (Pl. Dep. Tr. at 62). According to plaintiff, LoSavio suspended him for three days because Evans could not "get along in [any] department [LoSavio] put [him] in."

(*Id.* at 62, 64). Approximately two days into plaintiff's suspension, he again received a telephone call from human resources director Maxson. (*Id.* at 65). Maxson requested that plaintiff meet him at the store. (*Id.*).

Although plaintiff claims to have tape recorded their conversation, no tape or transcript thereof was produced. (*Id.* at 66). During his deposition, plaintiff could not remember much of the conversation with Maxson except that Maxson stated that Evans was "having a problem in the departments they[ ] [were] putting [him] in," and that Evans spoke "very loudly" and thereby "might intimidate people." (*Id.* at 66–67). According to LoSavio, he was also at the meeting and told Evans "that he had difficulty following directions, taking criticism and was unable to work with management." (LoSavio Aff. ¶ 5). LoSavio then dismissed Evans for insubordination. (*Id.*).

### B.  *Procedural History*

Plaintiff has exhausted his administrative remedies in a timely fashion as required by Title VII. On October 16, 1993, plaintiff filed a complaint with the New York State Division of Human Rights. In March 1995, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"). On January 12, 1996, the EEOC found that the evidence did not establish a violation of Title VII.

On April 11, 1996, within 90 days after the EEOC issued him a right-to-sue letter, Evans filed his initial complaint purporting to assert claims of discrimination and retaliation in violation of Title VII.[5] The original complaint, however, failed to survive defendant's motion to dismiss because, among other things, the complaint neither identified plaintiff's race or color, nor alleged that race or color played a role in plaintiff's dismissal. *Evans v. The Golub Corp.,* No 96 Civ. 3889(DC), 1997 WL 349952 (S.D.N.Y. June 23, 1997). Plaintiff was granted leave to file an amended complaint alleging "specific facts and circumstances that ... show he was

---

**5.** Although the complaint was not docketed until May 23, 1996, it was submitted to the *Pro Se* Office on April 11, 1996.

discriminated against because of his race or color." *Id.* at *2.

Plaintiff filed an amended complaint on July 18, 1997 that, liberally construed, alleged claims of disparate treatment, harassment, retaliation, and intentional infliction of emotional distress.[6] On July 30, 1997, defendant filed a motion to dismiss the amended complaint. The Court dismissed plaintiff's claims of retaliation because the amended complaint "failed to allege that [Evans] opposed an unlawful employment practice that resulted in an adverse action taken by the defendant in retaliation." *Evans v. The Golub Corp.*, No. 96 Civ. 3889(DC), 1997 WL 681348, at *3 (S.D.N.Y. October 27, 1997). The Court also dismissed the intentional infliction of emotional distress claim because the defendant's alleged behavior did "not rise to the level of outrageous and extreme conduct required by [New York] case law." *Id.* at *4. Plaintiff's claims of disparate treatment and harassment, however, survived. *See id.* at *2–3. The parties proceeded to conduct discovery.

These motions followed.[7]

### *DISCUSSION*

#### A. *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue

for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving parties favor. *See id.* at 249–50, 106 S.Ct. 2505.

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party may not rest upon mere "conclusory allegations or denials," but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984)). As the Supreme Court stated in *Anderson:* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

#### B. *Title VII Standards*

■ The "ultimate issue" in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," that is, that there was discriminatory intent. *Fields v. New York State Office of Mental Retardation and Dev. Disabilities*, 115 F.3d 116, 119 (2d Cir.1997); *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc* ), *cert. denied,* ―― U.S. ――, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Plaintiffs have generally sought to meet that burden by using a "mixed-motives" analysis, *see de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir.1996); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct.

6. Plaintiff attached his July 25, 1995 letter to the EEOC to his amended complaint. The Court construes this letter as part of the amended complaint.

7. Plaintiff only filed a memorandum of law in support of his motion for summary judgment. The Court also treats this memorandum as plain-

tiff's opposition to defendant's motion. Plaintiff claims to have "witnesses who can testify to the treatment [and] harassment that was projected towards [sic] him," (Pl. Mem. at 5), as well as tape recorded conversations with managers. Plaintiff did not, however, submit any affidavits, recordings, or transcripts thereof.

82, 121 L.Ed.2d 46 (1992), or by proving "pretext" under the three-part test first enunciated by the Supreme Court in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *de la Cruz*, 82 F.3d at 20.

As articulated in recent years, the three-step *McDonnell–Douglas* test theoretically operates as follows. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) he or she is a member of a protected class (2) who was qualified for his or her position (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell–Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997). Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden then "shifts" to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 879 (2d Cir.1997); *Fisher*, 114 F.3d at 1335–36. Third, if the defendant articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's*, 509 U.S. at 510–11, 113 S.Ct. 2742. The plaintiff must then show, without the benefit of any presumptions, that it is more likely than not that the employer's decision was motivated at least in part by a discriminatory reason. Because the defendant has at this point offered a nondiscriminatory reason for its actions, the plaintiff must show that the proffered reason is in reality a pretext for unlawful discrimination. *See Fisher*, 114 F.3d at 1337.

Although the *McDonnell–Douglas* framework has been with us for some twenty-five years, it has proven at times to be confusing and unworkable. For the reasons set forth in my Opinion in *Lapsley v. Columbia Univ.*, 999 F.Supp. 506 (S.D.N.Y.1998), I believe the *McDonnell–Douglas* test has outlived its usefulness. It should be discarded and courts

instead should focus on the "ultimate issue"—whether the plaintiff has proven that it is more likely than not that the employer's decision was motivated at least in part by an "impermissible," or discriminatory, reason. *See* Denny Chin & Jodi Golinsky, *Moving Beyond McDonnell Douglas: A Simplified Method for Assessing Evidence in Discrimination Cases*, 64:2 Brook.L.Rev. (forthcoming Jan. 1999).

In the summary judgment context, a more direct approach would refocus attention on what should be the central inquiry: the evidence, or lack of evidence, of discrimination in a particular case. In considering a summary judgment motion, courts should address the ultimate issue by examining whether the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that a defendant's decisions were motivated at least in part by an impermissible reason. *See Fisher*, 114 F.3d at 1347. The court should conduct this inquiry in the following manner: first, by evaluating plaintiff's proof, direct or otherwise, of discrimination; second, by evaluating defendant's proof that it did not discriminate, including evidence of defendant's explanations for its decisions; and third, by considering the evidence as a whole, resolving all conflicts in the proof and drawing all reasonable inferences in favor of the plaintiff.

In considering the ultimate issue, a factfinder at trial or a court considering a motion for summary judgment must bear two concepts in mind. First, the issue is intentional discrimination—the plaintiff has the burden at all times of proving, by a preponderance of the evidence, that he or she was the victim of intentional discrimination. *See St. Mary's*, 509 U.S. at 507, 113 S.Ct. 2742 (stating that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). It is not enough that the plaintiff was unfairly treated or that a defendant's stated reasons for its employment actions are proven to be pretextual. Rather, while unfair treatment and a defendant's false statements may constitute "pieces of circumstantial evi-

dence" that support a claim of intentional discrimination, the evidence as a whole must be sufficient to sustain an "ultimate finding" of intentional discrimination. *Fisher*, 114 F.3d at 1338.

Second, at the same time, proof of intentional discrimination is often elusive. Because an employer's "intent and state of mind are implicated," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), "direct, smoking gun, evidence of discrimination" is rarely available. *Richards v. New York City Bd. of Educ.*, 668 F.Supp. 259, 265 (S.D.N.Y.1987), *aff'd*, 842 F.2d 1288 (2d Cir. 1988). Courts must continue to be mindful that " 'clever men may easily conceal their motivations.' " *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d Cir.1979) (quoting *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)); *accord Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *see also Tyler*, 958 F.2d at 1187 ("[If] there is at the very least a thick cloud of smoke," an employer must "convince the factfinder that, despite the smoke, there is no fire.") (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 266, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). All a plaintiff need do is persuade a finder of fact, from all the evidence in the record, that it is more likely than not that the adverse employment decision was motivated at least in part by an impermissible reason.

## C. *Application*

■ As defendant relies on the *McDonnell–Douglas* test and it remains governing law, I am bound to apply it. Rather than do so formalistically, however, I assume that plaintiff has made out a prima facie case. Defendants have articulated legitimate, nondiscriminatory reasons for their actions. Hence, I proceed directly to the ultimate question: Whether Evans has presented sufficient evidence from which a reasonable jury could find discrimination. I do so by reviewing first Evans's evidence, then defendant's evidence, and finally the record as a whole.

### 1. *Plaintiff's Evidence*

Evans's purported evidence of discrimination consists of: (a) Hayduk denying plaintiff's request to be transferred to another shift and an allegation that Hayduk lied to LoSavio about plaintiff in an attempt to convince LoSavio not to permit plaintiff to switch shifts; (b) Crispino's purported use of profane language toward plaintiff and plaintiff allegedly being fired as a result; and (c) Hunt's and Lopez's alleged abrasive treatment of plaintiff and plaintiff's subsequent dismissal.

Plaintiff does not, however, allege that any of the defendant's employees made a single comment to him concerning his race or color. Neither does plaintiff present any evidence that he was treated poorly or fired because of his race or color.

I review the items of evidence in turn.

### a. *The Third Shift Claim*

Although plaintiff's request to be assigned to the third shift was ultimately granted, he makes four allegations that purportedly support his claims. First, Hayduk denied plaintiff's initial requests to switch shifts and plaintiff was only transferred after he made repeated requests to LoSavio. Second, according to Evans, Hayduk lied to LoSavio by wrongfully accusing Evans of coercing the other produce clerk to switch shifts even though Hayduk knew that the clerk had initiated the effort to switch. Third, Hayduk's attitude toward plaintiff changed from friendly to cold after Evans went over Hayduk's head to get permission for the shift transfer from the store manager. Fourth, apparently no minorities were assigned to the third shift before plaintiff was switched.

### i. *Hayduk's Initial Denial and LoSavio's Ultimate Grant of Plaintiff's Requests to Transfer*

According to plaintiff, Hayduk had no legitimate reason to deny plaintiff's request to switch shifts and plaintiff should not have had to repeatedly ask LoSavio for the transfer. (*See* Pl.Dep. Tr. at 40–41, 120–21). A clerk on the third shift had asked plaintiff to switch and no other employee was interested in the position. (*Id.* at 120–21). Plaintiff

had experience in produce including having worked as an assistant manager in another supermarket and thus was qualified to work on the third shift. (Am.Compl. at 1). Plaintiff does not present any evidence, however, that Hayduk's denial of his request or LoSavio's initial resistance to a switch was motivated by plaintiff's race or color.

#### ii. *Allegation that Hayduk Lied*

Plaintiff alleges that in an attempt to thwart plaintiff's efforts to switch shifts, Hayduk lied to LoSavio claiming that plaintiff was coercing the other clerk. Plaintiff speculates that Hayduk lied in retaliation for plaintiff attempting to move to the higher paying third shift. (Am.Compl. at 1). Plaintiff "would construe that lying [about] an employee would be considered *Disparate Treatment* [of the] highest degree." (Pl. Mem. at 3). Plaintiff does not allege, however, that Hayduk made any comments to LoSavio about plaintiff's race or color, and even assuming Hayduk did lie, there is no concrete evidence in the record to show that he did so because plaintiff was African American.

#### iii. *Hayduk's Alleged Change in Attitude Toward Plaintiff*

Plaintiff claims that after he went over Hayduk's head to get permission from LoSavio to switch shifts, Hayduk's attitude toward him changed. (Pl.Dep. at 43–44). Whereas they "used to talk about anything," have conversations, and joke, after plaintiff transferred shifts, Hayduk would only say "hi, bye, do this, do that." (*Id.* at 44). After plaintiff switched shifts, Hayduk also began to cut plaintiff's hours, criticize his work in a "nit[-]picking" manner, and "shun[ ]" him. (*Id.*). Plaintiff believes that the reason Hayduk's attitude changed was because he was unhappy that plaintiff went over his head. (*Id.* at 46). This may very well be true, but even so plaintiff does not allege that Hayduk's attitude changed because of plaintiff's race or color.

#### iv. *Lack of Minorities on the Third Shift*

Plaintiff points out that there were no African Americans assigned to the higher-paying third shift before he was transferred. Plaintiff admits, however, that there were four African American produce clerks on the two other shifts and that he ultimately was permitted to transfer after a few weeks. Plaintiff does not present any evidence that the lack of minorities on the third shift was a result of racial discrimination. Plaintiff does not, for instance, present any evidence that a white employee requested and received the transfer instead of or before plaintiff. Neither does plaintiff allege that there were other black employees who wanted to work the third shift and were denied.

### b. *The Crispino Incident and the First Dismissal*

#### i. *The Crispino Incident*

According to Evans, the Crispino incident demonstrates that he was treated differently because of his race. (Pl.Dep. Tr. at 46–47). Crispino's comments, however, while crude, were not racial in nature. (*See id.* at 52–53). Further, there is no evidence that Crispino only spoke that way to African American employees. Plaintiff has never observed or heard of Crispino arguing with or confronting another employee of any race or color. (*Id.* at 90).

#### ii. *The First Dismissal*

Plaintiff does not even allege that he was fired because of his race or color. Plaintiff asserts instead that the first time he was fired, poor work performance was a pretext for his being fired because he told LoSavio about the Crispino incident. (*See* Pl.Mem. at 2; *see also* Am.Compl. at 2 (stating that plaintiff brought the Crispino incident "to the attention of [his] store manager [and] for this [he] was *fired* the next day for "*POOR PRODUCTIVITY*"")). Plaintiff further suggests that defendant believed that Evans was somehow at fault for the Crispino incident and that he would not have been offered his job back had not another employee stepped forward to tell LoSavio what had happened in the storeroom. (*See* Pl.Mem. at 4).

Even if plaintiff was fired for telling LoSavio about the Crispino incident, and even if defendant initially believed that plaintiff somehow instigated the Crispino incident, these facts do not show that racial discrimination motivated the decision to dismiss him,

nor does plaintiff present any other evidence to support such a claim.

### c. The Bakery Department Incidents and Final Dismissal

#### i. The Lopez Incident

During his deposition, plaintiff initially claimed that Lopez's comments were directed toward him. (Pl.Dep. Tr. at 80). Plaintiff later conceded, however, that Lopez was directing his comments toward both him and the other employee working in the bagel section that morning. (Pl.Dep. Tr. at 129). Further, plaintiff does not present any evidence to support his claim that Lopez directed his comments only at plaintiff or that any of Lopez's comments referred to plaintiff's race or color. Moreover, there is no evidence that Lopez only spoke that way to African American employees. Indeed, the other employee who was subjected to Lopez's comments was white. Plaintiff has never observed any supervisor argue with or confront another employee of any color. (*Id.* at 91).

#### ii. The Hunt Incident

As mentioned above, although plaintiff claims to not recall any discussion with Hunt prior to their confrontation, plaintiff does not otherwise contest Hunt's version of the incident. Even if plaintiff did not disregard Hunt's direct request to refrain from confronting Lopez, plaintiff does not present any evidence of racial discrimination. Plaintiff does not, for example, allege that any of Hunt's comments were racial in nature. Further, there is no evidence that Hunt only confronted African American employees as plaintiff has never observed Hunt argue with or confront another employee of any color. (*Id.* at 90).

#### iii. The Final Dismissal

Plaintiff challenges defendant's reasons for firing him the second time. First, plaintiff takes issue with the assertion that his employment was terminated for misconduct and refusal to follow instructions. (Am.Compl. at 3). Second, plaintiff asserts that neither Hunt nor LoSavio had any basis on which to claim that Evans's work performance was poor or that he was difficult to supervise.

(Pl.Mem. at 4). Plaintiff does not, however, present any evidence that his dismissal was based on his race or color. No evidence exists that any of defendant's employees made racial comments, that any other African American employees were fired, or that any white employees were not fired for similar alleged conduct.

### 2. Defendant's Evidence

Defendant presents substantial evidence to show that the behavior of its employees toward plaintiff and its twice firing him were not motivated by any impermissible reason.

### a. The Third Shift Claim

#### i. Hayduk's Initial Denial and LoSavio's Ultimate Grant of Plaintiff's Requests to Transfer

According to Hayduk, he denied plaintiff's request to transfer shifts because Evans had demonstrated low motivation and poor work quality. (Hayduk Aff. ¶ 3–4). Hayduk did not believe plaintiff was responsible enough to be transferred to the third shift because there was no supervision on that shift. (*Id.* ¶ 4). Further, Hayduk believed that the employees assigned to the third shift were working well together. (*Id.*). Plaintiff does not specifically dispute these assertions although he claims to have been complimented on his work. (Pl.Dep. Tr. at 130–31). Plaintiff also appears to contest that he was responsible for keeping the displays in order and presumably that therefore defendant cannot fault him for failing to do so. (Pl. Mem. at 1).

LoSavio does not respond to plaintiff's complaint that he had to repeatedly approach LoSavio before LoSavio ultimately granted plaintiff's request to transfer.

#### ii. Allegation that Hayduk Lied

Defendant has not presented evidence to contest plaintiff's allegation that Hayduk lied to LoSavio by claiming that plaintiff was attempting to coerce the clerk to switch shifts.

### iii. *Hayduk's Alleged Change in Attitude Toward Plaintiff*

Hayduk admits that he was unhappy with LoSavio's decision to transfer Evans over Hayduk's objections. (*Id.* ¶ 5). Hayduk does not deny that his attitude toward plaintiff changed from friendly to cool after plaintiff's transfer.

### iv. *Lack of Minorities on the Third Shift*

Defendant argues that plaintiff's claim that no African American employees had ever been assigned to the third shift is insignificant because the store had just opened and plaintiff was among the first group of employees at the store. (Def.Mem. at 13–14).

### b. *The Crispino Incident and the First Dismissal*

#### i. *The Crispino Incident*

Defendant does not deny the Crispino incident. Defendant points out, however, that plaintiff does not accuse Crispino of using any racial epithets or saying anything else that otherwise hinted of racism. (Def.Mem. at 14). Defendant further argues that plaintiff has no basis to claim that Crispino only used profanity with African American employees or that Crispino only used profanity with plaintiff because he was African American. (*Id.*). Defendant notes that during plaintiff's deposition, he speculated that Crispino may have been "having a bad day." (Pl.Dep. Tr. at 56; Def.Mem. at 14).

#### ii. *The First Dismissal*

Defendant does not specifically respond to plaintiff's claim that he was fired for telling LoSavio about the Crispino incident, or that plaintiff was rehired because an employee came forward supporting his account of the incident.

Hayduk claims that his initial fears concerning plaintiff's work performance were borne out after plaintiff was transferred to the third shift. (Hayduk Aff. ¶ 5). According to Hayduk, plaintiff's performance was consistently substandard and plaintiff restricted his output, took breaks without consulting Hayduk, and was regularly caught talking to friends while on the job. (*Id.*). Hayduk claims that plaintiff "was extremely defensive" and at one point accused Hayduk

of being "a 'rookie manager' who did not know [his] job." (*Id.*). Hayduk issued two formal warnings to Evans before firing him. *See supra* n. 3. Hayduk fired plaintiff when plaintiff's poor work performance and disruptive behavior continued. (Hayduk Aff. ¶ 7).

According to LoSavio, despite complaints he had received from Hayduk about plaintiff, and because he believed Evans could be a good employee, LoSavio rehired plaintiff giving him "the benefit of the doubt." (LoSavio Aff. ¶ 6). LoSavio hoped that plaintiff's problems were the result of a personality conflict with Hayduk that could be avoided by placing Evans in another department. (*Id.*). LoSavio admits that he "normally would not transfer a 'problem' employee to another department," but claims that he "wanted to give [plaintiff] every possible opportunity to succeed at Price Chopper." (*Id.*).

Plaintiff challenges Hayduk's claims and LoSavio's explanation for why he rehired plaintiff by indirectly arguing that LoSavio would not have rehired him if it were true that his work performance was poor and that he displayed disruptive behavior. (Pl.Mem. at 2). Plaintiff also claims that the real reason he was rehired was because someone came forward who supported plaintiff's version of the Crispino incident. (*Id.*).

### c. *The Bakery Department Incidents and Final Dismissal*

#### i. *The Lopez Incident*

Defendant does not respond to plaintiff's claim that he and another employee were reprimanded by Lopez.

#### ii. *The Hunt Incident*

According to LoSavio, he told plaintiff that he could have a fresh start in the bakery department and that "there would be no grudges or repercussions." (LoSavio Aff. ¶ 7). Losavio told Hunt that plaintiff "was starting with a clean slate." (*Id.*). According to Hunt, he did not know the specifics of why plaintiff was transferred to his department. (Hunt Aff. ¶ 2). Hunt claims to have told plaintiff that he "did not care what [had] happened in the produce department, that

[he] believed in giving people second chances, and that [plaintiff] would get a new start" in the bakery department. (*Id.*). Plaintiff does not dispute these claims.

Hunt claims that Evans complained constantly, routinely left before the end of his shift, and frequently failed to finish work when he had more than enough time to do so. (*Id.* ¶ 4). Hunt also asserts that plaintiff "generally exhibited an extremely bad attitude toward his work." (*Id.*). Hunt reported his complaints about plaintiff to LoSavio. (*Id.;* LoSavio Aff. ¶ 8). Plaintiff claims that Hunt could not have had a sufficient basis on which to allege that Evans's performance was poor because Hunt did not arrive at the store until the end of plaintiff's shift. (Pl. Mem. at 4–5). According to plaintiff, his shift ended at 9:00 A.M. and Hunt usually arrived between 6:00 and 7:00 A.M. (Pl.Dep. Tr. at 59–60). A reasonable jury could only conclude that this two or three hour overlap between plaintiff's shift and when Hunt was at the store was a sufficient time in which Hunt could have observed plaintiff's performance alleged here.

As described above, prior to the confrontation between Hunt and plaintiff, Hunt had instructed plaintiff not to confront Lopez to which plaintiff responded in a "threatening manner" by saying: "[D]on't worry about it, me and Steve will talk." (Hunt Aff. ¶ 5). Despite a subsequent warning from Hunt, plaintiff approached Lopez when he entered the department. (*Id.* 5–6). The argument between plaintiff and Lopez became very heated and Hunt feared that it would escalate into a physical altercation. (*Id.* ¶ 6). Hunt ultimately asked plaintiff to leave the store after plaintiff insulted him, but Evans refused and instead waited for LoSavio. (*Id.*). According to Hunt, plaintiff directed a racial epithet toward him and threatened to physically harm him and Lopez.[8] (*Id.*). Plaintiff does not dispute defendant's version of the incident.

### iii. The Final Dismissal

Soon after plaintiff began in the bagel section of the bakery department, LoSavio began to receive complaints from Hunt that plaintiff's performance was poor and that plaintiff was difficult to supervise. (LoSavio, Aff.¶ 8). After the Hunt incident, LoSavio "concluded that [plaintiff] was an unmotivated, disruptive employee." (*Id.*). A few days later, Hunt and Maxson met with plaintiff and informed him "that he had difficulty following instructions, taking criticism and was unable to work with management." (*Id.*). Plaintiff was then fired for insubordination. (*Id.*).

### 3. The Record as a Whole

Considering the evidence as a whole, resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiff's favor, I conclude that a reasonable jury could not find that plaintiff was discriminated against for an impermissible reason.

Plaintiff does not present sufficient evidence to support a finding by a jury that he was discriminated against because of his race or color. While plaintiff has presented some evidence of adverse treatment, he has not presented any evidence to show that the adverse treatment was motivated by race or color. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, ——, 118 S.Ct. 998, 1002–03, 140 L.Ed.2d 201 (1998) (noting that Title VII should not be expanded into "a general civility code"). Although he makes conclusory allegations of pretext, those allegations are undermined to a great extent by the largely undisputed evidence that plaintiff's work was poor and that he took breaks without informing his supervisor, left before the end of his shift, failed to complete work when he had enough time to do so, insulted his managers, ignored Hunt's direct order not to confront Lopez, directed a racial epithet at Hunt, and threatened Hunt and Lopez with physical harm. Evans had difficulty with four supervisors and he was fired twice. Moreover, even if a reasonable jury could

---

8. Hunt claims that plaintiff pointed his finger in Hunt's face and said: "[H]ow do you like being told what to do you nigger? I am here talking to [LoSavio], and if I get fired, I'm going to come back and get you and your buddy." (Hunt Aff. ¶ 7). Plaintiff does not deny that he made this statement.

find pretext, on the undisputed facts no reasonable jury could find that the pretext was a disguise for racial discrimination. There are no discriminatory comments or any other concrete evidence in the record to support a racial discrimination claim.

■ To merit a trial on either of Evans's claims, the evidence must show that, more likely than not, defendant's "proffered reason[s] [were] not the true reason for the employment decision[s], and that race was." *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc*), *cert. denied*, — U.S. —, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see also Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 ("An employer's reason for termination cannot be proven to be a pretext for discrimination unless it is shown to be false *and* that discrimination was the real reason."). Even if as plaintiff claims, defendant "is totally responsible for the callous treatment, abuse [and] disregard for personal feeling" (*see* Pl.Mem. at 7), without evidence that this behavior was motivated by race or color, plaintiff's claims must fail. Plaintiff has simply not presented sufficient evidence to support a jury verdict in his favor on the "ultimate issue." Accordingly, defendant is entitled to summary judgment dismissing plaintiff's disparate treatment and harassment [9] claims.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. The remaining claims of the amended complaint are hereby dismissed

with prejudice. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

---

9. Harassment is actionable under Title VII if it is motivated by plaintiff's race, color, or some other protected basis, and results in a hostile or abusive work environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To prevail on his claim of harassment, plaintiff must demonstrate that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, ... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. "Conduct that is 'merely offen-

sive' and not severe or pervasive ... is beyond Title VII's purview." *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997) (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367). As discussed above, plaintiff has failed to present any evidence that any of the incidents identified by plaintiff were motivated by plaintiff's race or color and no reasonable jury could conclude so. Further, these incidents, individually or together, are not sufficiently severe or pervasive to establish a hostile or abusive work environment.