Lori A. MECKENBERG, Plaintiff,

v.

NEW YORK CITY OFF–TRACK BETTING, Hazel Dukes, Nicholas Romano, and Robert Palumbo, Defendants.

No. 96 CIV. 5236(RLC).

United States District Court, S.D. New York.

April 13, 1999.

Mandy R. Steele, East Brunswick, NJ, Mandy R. Steele, of counsel, for Plaintiff.

Corporation Counsel of the City of New York, New York, John F. Wirenius, of counsel, for Defendants.

*OPINION*

ROBERT L. CARTER, District Judge.

Plaintiff Lori A. Meckenberg ("Meckenberg") brings this action against defendants New York City Off–Track Betting ("OTB"), Hazel Dukes ("Dukes"), Nicholas Romano ("Romano"), and Robert Palumbo ("Palumbo"), asserting claims under Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983, and common law breach of contract and intentional infliction of emotional distress. Meckenberg alleges that defendants discriminated against her on the basis of gender and race during her employment with OTB, that she was subject to a hostile work environment, and that defendants retaliated against her when she complained of the discriminatory treatment. Now before the court is defendants' motion for summary judgment, pursuant to Rule 56, F.R. Civ. P., on all of plaintiff's claims.

## BACKGROUND [1]

Meckenberg, a white female, began her employment with OTB as a secretary in November, 1978. She subsequently applied for and received a position as a Racing Data Coordinator in the newly created Operations Center ("OPCEN") in June, 1980. During her stint as a Racing Data Corrdinator, Meckenberg expressed interest in obtaining a supervisory position within OPCEN. However, she claims that she was passed over for promotion on two occasions. On one occasion, Meckenberg asserts that she was told by Jeff Goldberg, an OTB program director, that she would be bypassed in favor of an African–American woman because the "woman was black and [Goldberg] didn't want her to go running to the NAACP." (Compl.¶ 7). On another occasion, Meckenberg was allegedly told by Ray Sancho ("Sancho"), also an OTB director, that she would not received

---

**1.** For some events, neither plaintiff nor defendants have adduced specific dates. This ab- sence is reflected in the court's discussion.

the position because she had "pissed off a couple of Vice Presidents [at OTB]." (Compl.¶ 11). Evidently, Sancho was referring to a dispute between Meckenberg and a OTB employee named Bettye Page ("Page"), an African–American woman, where Page threw a mirror at plaintiff. Plaintiff states that she attempted to address the dispute with OTB management, but was rebuffed because of Page's race. (Meckenberg Aff. ¶ 11). Meckenberg also alleges that Page called her a "white mother fucker" on unspecified occasions but presumably before Page was laid off in 1993.

Meckenberg claims that she was denied promotion to an OPCEN supervisor because of her race or gender, despite being assured by various OTB managers that she was a capable employee and that she would receive full consideration for the position. (Compl.¶¶ 8, 11, 14, 20). Eventually, Meckenberg approached defendant Dukes, who was then a Senior Director of Administrative Services, about the discriminatory conduct on or about August, 1989. (Meckenberg Dep. at 56; Compl. ¶ 16). Dukes, according to plaintiff, encouraged her to file a discrimination complaint with the New York State Division of Human Rights. (Compl.¶ 16). In December, 1990, Meckenberg and the OTB reached a conciliation agreement ("Conciliation Agreement" or "Agreement") whereby Meckenberg would receive a promotion to Principal Racing Data Coordinator in OPCEN. (Defs.' Mot. for Summ. J., Ex. A). Meckenberg agreed to take the position for an annual salary of $32,000, after rejecting OTB's initial offer of $29,000. (Defs.' Mot. for Summ. J., Ex. A). Furthermore, under the Agreement, Meckenberg waived any claims to retroactive wages, salary, or benefits. (Defs.' Mot. for Summ. J., Ex. A). OTB agreed not to retaliate against Meckenberg for bringing the complaint. (Defs.' Mot. for Summ. J., Ex. A). However, she contends that Nick Cirillo ("Cirillo"), Vice President of Racing Operations, immediately expressed his dislike for plaintiff, stating that she wasn't fit to manage and that she would never get another raise at OTB. (Meckenberg Dep. at 192). Meckenberg also claims that Cirillo once called her a "pain in the ass" and a "bitch" for vocalizing her complaints sometime around 1990 to 1991, and told her that some departments at OTB were "no place for a woman" in 1989 or some date prior to that year. (Meckenberg Dep. at 52, 192).

Meckenberg states that upon commencing her position as a manager, she attempted to "reform the department and instill additional responsibility into the staff." (Compl.¶ 24). The staff, however, responded with disrespect and resentment, and often ignored her memos and directives. (Compl.¶¶ 24–25). On February, 24, 1991, Meckenberg claims that she found most of the staff engaged in "stealing time;" that is, having another employee punch in one's time card while one is absent from work. (Compl.¶ 25). She reported the incident to Sancho, who did not respond. (Compl.¶ 25). Meckenberg asserts that in another incident, Dukes proved to be similarly unresponsive to plaintiff's concerns by refusing to adequately investigate the theft of papers from her desk. (Meckenberg Dep. at 175–76). When pressed to continue the investigation, Dukes allegedly threatened Meckenberg with termination if she did not drop the matter. (Meckenberg Dep. at 176).

OTB was also unresponsive to Meckenberg's requests for additional support in OPCEN, or in the alternative, for a transfer to a different department. From late 1993 to 1995, layoffs, terminations, and other absences created a shortage of staff in the OPCEN department. (Compl.¶¶ 27–31). By March, 1995, Meckenberg alone was responsible for the entire department. (Compl.¶ 31). Meckenberg asked for additional staff support from defendant Romano, who was her supervisor, but did not receive such help. (Compl.¶ 32). Failing to receive the help

she needed, Meckenberg applied for a lateral transfer to the position of Senior Buyer on June 20, 1995. (Compl. ¶ 33). After interviewing for the position, she received notification that she had not received the job because she did not have the requisite qualifications. (Meckenberg Dep. at 119). On June 26, 1995, she requested a transfer to either the Telephone Betting, Intergovernmental Affairs, or Media Relations department. (Compl. ¶ 34). Romano refused to grant her transfer request, telling her that she was vital to the OPCEN department. (Meckenberg Dep. at 122). The position at Intergovernmental Affairs was eventually given to Dennis McManus who, according to Meckenberg, was less experienced than she. (Compl. ¶ 35). Meckenberg also made a written request for transfer to Allie Sherman ("Sherman"), the President of OTB at the time, in late June, 1995 that was never answered. (Compl. ¶ 36). Meckenberg states that she was informed shortly thereafter that Romano and defendant Palumbo, an Executive Vice President at OTB, had decided that she would stay at her current position for the time being. (Compl. ¶ 37). Plaintiff also claims that Romano "thwarted" her attempts to speak to Sherman about her transfer request and told her that she would not be allowed to speak with Sherman until Sherman had finished preparing the OTB budget. (Compl. ¶ 37; Meckenberg Dep. at 131–32). In essence, Meckenberg believed that she was being "held hostage" at OPCEN. (Meckenberg Dep. at 133).

On June 28, 1995, Meckenberg called a radio talk show that was being co-hosted by New York City Mayor Rudolph Giuliani ("Mayor Giuliani"). During the conversation with Mayor Giuliani, she asserted that she was being "harassed," "denied advancement," "suppressed," and "threatened" at OTB. (Compl. ¶ 39). The call was followed by an off-air conversation with Bruce Teitelbaum ("Teitelbaum"), a New York City official, who stated that the Mayor's office planned to investigate her complaints regarding the OTB. (Compl. ¶ 39).

Meckenberg asserts that as a result of those conversations with Mayor Giuliani and Teitelbaum, defendants retaliated against her. Specifically, she claims that immediately after her call to Mayor Giuliani, Romano removed posters on the glass windows surrounding her cubicle that she used to create privacy. (Compl. ¶ 40; Meckenberg Dep. at 153). Romano subjected her to increased supervision, requiring her to account for "every minute" of her day. (Meckenberg Dep. at 153). "Similarly situated male employees" were not subject to the same treatment. (Compl. ¶ 40). Romano also suddenly became stringent with her arrival time at OTB, docking her pay for arriving a few minutes late. (Compl. ¶ 40; Meckenberg Dep. at 158). Romano also restricted her use of the telephone for personal calls. (Meckenberg Dep. at 162–63). In addition, Meckenberg claims that Palumbo criticized her at a meeting sometime around July 4, 1995 for calling Mayor Giuliani. Palumbo allegedly said that her complaint to Giuliani "might not have been the brightest thing to do if one wanted to advance." (Meckenberg Dep. at 138).

On July 7, 1995, Meckenberg met with Sherman and Palumbo to discuss a recent request for a transfer out of OPCEN. (Compl. ¶ 42). At the meeting, Sherman allegedly stated that he would indeed grant her request by July 19, 1995. (Compl. ¶ 42). However, she was informed on July 21, 1995 by Sherman and Palumbo that she would not be transferred in the "best interest of the company." (Compl. ¶ 43; Meckenberg Dep. at 140). On that same day, Romano allegedly questioned the veracity of a note by Meckenberg's doctor stating that she was not to work more than 35 hours per week without a day off. (Compl. ¶ 44). While Romano accommodated her medical necessity, he also threatened to deny plaintiff her annual vacation days. (Compl. ¶ 44). Meckenberg also claims that Sherman reneged on sub-

sequent promises to hire additional staff for the OPCEN department. (Compl.¶¶ 45–46). On August 2, 1995, Meckenberg filed a Charge of Discrimination with the Equal Opportunity Employment Commission, alleging a Title VII violation. (Defs.' Mot. for Summ. J., Ex. B).

Meckenberg alleges that eventually the stress from her job situation and the discriminatory treatment by defendants caused her to have a "spastic colon attack" on August 29, 1995. (Meckenberg Dep. at 142–43). Due to the severe nature of her illness, she asked Romano to have someone check her work for that day. (Compl.¶ 13). Romano, however, allegedly refused to help Meckenberg, stating that "it's your department, it's your responsibility." (Compl.¶ 47). Upon failing to receive the requested help from Romano, Meckenberg attempted to speak to Sherman who directed her to Robert Unger ("Unger"), the inspector general for the OTB. (Compl.¶ 49). As a result of her meeting with Unger, she was transferred temporarily to the Telephone Betting Deposit Accounts ("TBDA").

However, according to plaintiff, the harassment continued after her transfer out of OPCEN. On September 1, 1995, Meckenberg attempted to pick up her paycheck from the payroll department. (Compl.¶ 52). She was informed that Romano had ordered that the checks only be released to his secretary. (Compl.¶ 52). It was only after she enlisted the help of an OTB supervisor that she was able to receive her paycheck. (Compl.¶ 52).

On September 6, 1995, Meckenberg met with Doreen Wong ("Wong"), the OTB's equal employment opportunity director. (Compl.¶ 52). Wong allegedly asked Meckenberg to drop her EEOC complaint in exchange for being assigned to the TBDA department permanently. (Compl.¶ 53). Meckenberg stated that she did not wish to be assigned to the TBDA; rather, she told Wong that she would drop her suit on the following conditions: that she could work Monday through Friday, from 9 a.m. to 5 p.m.; that the time docked from her paycheck be returned; that she be ensured that her paycheck never be withheld again; and that she have the final acceptance on any permanent position to which she would be assigned. (Compl.¶ 54). Around this time, Palumbo allegedly threatened Meckenberg again, stating that he would "make [her] life so miserable downstairs that [she] would be forced to quit if [she] didn't back off." (Meckenberg Dep. at 184). Meckenberg continued to press for a transfer and met with two OTB directors about openings in other departments in early September, 1995. Eventually, she accepted a position in the Customer Service Department, where the hours were 9 a.m. to 5 p.m. with weekend work required on some occasions. (Compl. ¶ 56; Meckenberg Dep. at 152). Meckenberg does not allege any discriminatory treatment once she transferred to the Customer Service Department, where she worked until her voluntary resignation in April, 1997.

In addition to the specific incidents already described, Meckenberg alleges she was victim of a number of ongoing discriminatory practices at OTB, including receiving less pay than other managers at OPCEN on account of her gender and being treated differently on account of her race. For instance, Meckenberg states that she was not allowed to read at her desk, although two black females were permitted to read the Bible. (Compl.¶ 57).

Meckenberg filed her complaint in this court on July 12, 1996 after receiving a Notice of a Right to Sue letter from the EEOC on April 26, 1996. Defendants moved for summary judgment, pursuant to Rule 56, F.R. Civ. P., on substantive and procedural grounds on June 15, 1996.

## DISCUSSION

### I. Summary Judgment Standard

Under Rule 56(c), F.R. Civ. P., summary judgment is rendered when "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." "[T]he substantive law will identify which facts are material ... [and] [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine issue of material fact exists rests on the party seeking summary judgment. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994). Furthermore, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1223 (2d Cir. 1994). Thus, "not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them." *Donahue v. Windsor Locks Bd. of Fire Commissioners*, 834 F.2d 54, 57 (2d Cir.1987). On a motion for summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Chambers*, 43 F.3d at 36–37 (quoting *Donahue*, 834 F.2d at 58).

▬ Additional considerations should be taken into account when deciding whether summary judgment is appropriate in an employment discrimination case. *See Gallo*, 22 F.3d at 1224. When an employer's

intent, motivation, or state of mind is at issue, summary judgment should be granted sparingly. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (summary judgment is "ordinarily inappropriate where an individual's intent and state of mind are implicated."). Nevertheless, the plaintiff must offer " 'concrete evidence from which a reasonable juror could return a verdict in his favor.' " *Dister*, 859 F.2d at 1114 (quoting *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. 2505).

## II. Statute of Limitations

### A. Title VII

▬ Defendants first argue that portions of plaintiff's Title VII claims are time-barred.[2] In states such as New York that have an agency charged with handling discrimination complaints, the statute of limitations for filing a charge with the EEOC is 300 days. *See* 42 U.S.C. § 2000e–5(e)(1). Failure by the plaintiff to file a timely charge with the EEOC bars the civil claim in federal court unless the defendants waive the requirement or are estopped from asserting it, or unless the limitations period is tolled. *See Baba v. Warren Management Consultants, Inc.*, 882 F.Supp. 339, 342 (S.D.N.Y.1995) (Batts, J.) (quotation marks omitted). Thus, defendants urge the court to disregard any claims based on discriminatory

2. Meckenberg has brought suit against defendants Dukes, Romano, and Palumbo for violations under Title VII. It is not clear whether she intended to sue the individual defendants in their personal or official capacity. Regardless, the Title VII claims against Dukes, Romano, and Palumbo are dismissed as individual supervisors are not liable in their personal capacity, *see Tomka v. Seiler*, 66 F.3d 1295, 1313 (2d Cir.1995), nor in their official capacity under Title VII. *See Catalan v. Andrew Freedman Home*, 1998 WL 19990, *1 (S.D.N.Y. Jan.21, 1998) (Martin, J.) (noting suits against individual supervisors inappropriate under Title VII where employer itself

can be sued); *Gray v. Shearson Lehman Bros.*, 947 F.Supp. 132, 136 (S.D.N.Y.1996) (Mukasey, J.) (noting that "there is nothing to show that Congress intended to permit suits against individuals in their official capacity."); *Bonner v. Guccione*, 916 F.Supp. 271, 279 (S.D.N.Y.1996) (Cote, J.) (noting that *Tomka* decision militates against the crafting of a private action against employees acting in their 'official capacity.' "); *Harrison v. Indosuez*, 6 F.Supp.2d 224, 229 (S.D.N.Y.1998) (Leisure, J.); *Seres v. Liberty Chevrolet, Inc.*, 1999 WL 11779, *1 (S.D.N.Y. Jan.12, 1999) (Patterson, J.).

acts prior to October 7, 1994 [3]—300 days prior to plaintiff's August 2, 1995 EEOC filing.

Plaintiff argues that the limitations period should be tolled under the "continuing violation" exception. Under this exception, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993) (citations omitted). However, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Id.* Rather, the continuing violation exception applies only where discrimination is accomplished through a specific policy or mechanism, such as discriminatory seniority lists and employment tests, *see Lambert*, 10 F.3d at 53, or "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994). The determination of whether the exception applies must also be informed by the unfavorable view of continuing violation arguments held by courts in the Second Circuit. *See Riedinger v. D'Amicantino*, 974 F.Supp. 322, 325 (S.D.N.Y.1997) (Parker, J.) (noting that only compelling circumstances warrant application of exception); *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (Goettel, J.) (collecting cases).

Meckenberg's argument on this point is highly conclusory and relies primarily on decisions neither controlling nor persuasive in this court. Nevertheless, the court gleans that plaintiff is asserting that the following acts by OTB constitute continuing violations sufficient to justify tolling of the 300–day limitations period: 1) pay discrimination throughout her career at OTB; 2) failure to promote her on numerous occasions; and 3) permitting ongoing discriminatory and retaliatory acts by Meckenberg's supervisors.

With regard to pay discrimination, plaintiff appears to argue that the denial of equal pay is equivalent to a continuing violation because the discrimination recurs with the issuance of each pay check. However, the Second Circuit in *Pollis v. New School for Social Research*, 132 F.3d 115 (2d Cir.1997), distinguished pay discrimination from policies such as a discriminatory seniority list. *See id.* at 118. Unlike the wrongful denial of seniority rights, which causes harm not so much at the moment of denial as in the future and thus requires a retroactive remedy, a discriminatory pay scale has immediate effect, and requires nothing more than discontinuance of the unlawful conduct. *See id.* Indeed, "a claim of discriminatory pay is fundamentally unlike other claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action." *Id.* at 119. Thus, recurring pay discrimination does not constitute a continuing violation, as each receipt of a paycheck is the basis for a separate cause of action for which suit must be brought within the limitations period. *See id.* at 119. *See also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997) (holding that denial of pay increase did not constitute continuing violation).

Plaintiff's claim that OTB's failure to promote her was part of a continuing violation must also be dismissed. Meckenberg has not alleged a "specific discriminatory polic[y] or mechanism[ ]" responsible for the failure to promote her,

**3.** In defendants' Memorandum of Law in Support of Their Summary Judgment Motion, counsel calculated the cut-off date as May 29, 1994. (Mem. of Law in Supp. of Their Summ. J. Mot. at 14). The correct date, as calculated by the court, is October 7, 1994.

see *Lambert,* 10 F.3d at 53; rather, she has merely alleged that on various occasions, she was denied promotion to positions in different areas by different supervisors: twice in the 1980s by Jeff Goldberg for the position of Principal Racing Data Coordinator in OPCEN (which she eventually received), and numerous times in 1995 by Romano and Palumbo for positions outside of OPCEN. While plaintiff need not demonstrate a formal discriminatory mechanism in order to trigger the continuing violation exception, *see Cornwell,* 23 F.3d at 704, she must nevertheless show that "the discriminatory acts within and without the limitation period are sufficiently similar and frequent to justify a conclusion that both are part of a single discriminatory practice chargeable to the employer .... " *See McKenney v. New York City Off–Track Betting Corp.,* 903 F.Supp. 619, 622 (S.D.N.Y.1995) (Kaplan, J.) (internal quotation marks omitted). Meckenberg simply has not alleged the requisite connection between the two incidents in the 1980s and the incidents in 1995,[4] and therefore fails to allege a continuing violation on the basis of the failures to promote. *See also Blesedell,* 708 F.Supp. at 1415–16 (finding no continuing violation where plaintiff did not allege facts tending to connect the promotion incidents); *Samuel v. Merrill Lynch Pierce Fenner & Smith,* 771 F.Supp. 47, 49 (S.D.N.Y.1991) (Kram, J.) (no continuing violation where promotion decisions made by two different individuals); *Neilson v. Colgate–Palmolive Co.,* 1997 WL 297051, *1 (S.D.N.Y. June 4, 1997) (Rakoff, J.) (no continuing violation where plaintiff had only adduced evidence of failure to promote by different supervisors in different locations and subsidiaries of company).

 ▮▮▮▮ ' Lastly, Meckenberg argues that the constant harassment she received throughout her employment at OTB con-

stitutes a continuing violation. Evidence that supports a hostile environment claim may also support the finding of a continuing violation. *See, e.g., Cornwell,* 23 F.3d at 704; *Riedinger,* 974 F.Supp. at 326. In *Riedinger,* for example, plaintiff claimed that she was subjected to unwelcome physical contact and sexually explicit remarks by her supervisor over a 17–month period, and catalogued in detail over a dozen instances of sexually inappropriate behavior directed at her. *See Riedinger,* 974 F.Supp. at 327. The court found plaintiff's allegations sufficient to deny defendant's summary judgment motion on statute of limitations grounds and on plaintiff's hostile environment claim, noting that "by its nature, a claim of 'hostile environment' discrimination turns on the existence of continuing violation." *Id.* at 326 (citations and internal quotation marks omitted). *See also Shull v. Rite Aid Corp.,* 1997 WL 289460, *5 (S.D.N.Y. May 30, 1997) (Sand, J.) (allegations of repeated sexual advances and comments supported continuing violation and hostile environment claims); *McKenney,* 903 F.Supp. at 622 (same).

 ▮▮▮▮ In the instant case, however, Meckenberg has not sufficiently pleaded a hostile environment claim based on defendants' actions before October 7, 1994 and thus, as a matter of law, cannot demonstrate a continuing violation. A hostile work environment claim is actionable if the alleged conduct amounts to " 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Meckenberg's allegations of harassment before October 7, 1994 do not rise to the

---

4. The court notes that even had Meckenberg successfully alleged a "continuing violation" based on the failures to promote, recovery for Meckenberg's claims regarding the incidents in 1986 and 1989 are barred nonetheless as those incidents were resolved and remedied in the 1990 Conciliation Agreement whereby Meckenberg received the promotion she desired.

level of severity and pervasiveness required to find a hostile environment. Meckenberg alleges that Cirillo once called her a "pain in the ass" and a "bitch," and that Page called her on occasion a "white mother fucker." Those incidents, standing alone, are not so severe or pervasive as to create a hostile workplace. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1306 n. 5 (2d Cir.1995) ("[I]solated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can be termed pervasive."); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, ... there must be a steady barrage of opprobrious racial comments.") (citations and internal quotation marks omitted).

Moreover, the other incidents of harassment Meckenberg describes cannot be reasonably attributed to a discriminatory animus, and thus cannot be properly considered as part of her hostile environment claim. *See Evans v. Golub Corp.*, 29 F.Supp.2d 194, 206 (S.D.N.Y.1998) (Chin, J.) (granting employer's summary judgment motion where plaintiff presented some evidence of adverse treatment, but no evidence that such treatment was motivated by race or color). Meckenberg claims that her staff was disrespectful, and resented her attempts to instill responsibility; that Dukes failed to investigate the theft of papers from her desk and a dispute between her and another employee to her full satisfaction; and that layoffs and terminations within OPCEN left her with too much responsibility. While these incidents may have resulted in an unpleasant workplace situation, Meckenberg has failed to allege any facts that would allow a reasonable factfinder to believe that her gender or race placed a part in these decisions. The mere fact that Meckenberg is white and female and that she did not always receive the respect and help she desired does not create the inference that the treatment was motivated by a discriminatory animus.

Neither can Meckenberg's allegations regarding Romano's harassment, which included not allowing her to read at her desk, accusing her of falsifying her time card, and insisting that she use a time clock, be ascribed to a discriminatory animus. Meckenberg argues that Romano favored black female employees by not subjecting them to the same stringent time requirements and permitting them to read the Bible at their desks. (Mem. of Law in Opp. to Defs.' Mot. for Summ. J. at 15). However, these allegations are insufficient to indicate a discriminatory motivation because those employees were not managers, and thus were not similarly situated to Meckenberg. *See also Mustafa v. Park Lane Hotel*, 12 F.Supp.2d 360, 363 n. 6 (S.D.N.Y.1998) (Parker, J.) (noting that employer's holding of supervisory employee to higher standards is not indicative of discrimination). Moreover, Meckenberg's own testimony indicates that the adverse treatment she received was a result of a personality conflict between her and Romano.[5] While the personality conflict between Romano and Meckenberg may have

---

5. Meckenberg testified that she did not get along with Romano because he was "a very hard nosed, vindictive type of individual who at many points would in my opinion harass and discriminate against various individuals in that department." (Meckenberg Dep. at 85). When asked how employees ended up on the bad side of Romano, Meckenberg states: "Arguing with him, not agreeing with him, things like that." (Meckenberg Dep. at 86). When asked what led to her poor relationship with Romano, she explains: "I didn't agree with some of the ways he ran his department, didn't believe that he was a manager sticking up for me as another manager. Things like that." (Meckenberg Dep. at 87). Moreover, she has failed to allege a single racist or sexist remark made by Romano, either directed to her or others in her presence. *See also Johnson–Memoli v. ADT Security Services*, Inc., 1998 WL 352591, *3 n. 2 (S.D.N.Y. June 26, 1998) (Cote, J.) (noting failure by plaintiff to identify any racially derogatory comments directed towards her in dismissing hostile environment claim).

led to adverse or differential treatment, the "law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved." *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) (Motley, J.).

As the court finds no basis upon which a reasonable factfinder could infer a continuing violation, Meckenberg's Title VII claims based on acts occurring prior to October 7, 1994 are time-barred.

## B. Section 1983

■ The applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years. *See Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (citations omitted). Meckenberg filed her action on July 12, 1996; defendants seek dismissal of the portion of her § 1983 claim based on acts prior to July 12, 1993. As Meckenberg has not proffered any reasons as to why the statute of limitations should be tolled, she is barred from grounding her § 1983 claim on acts occurring prior to July 12, 1993.

## III. Title VII

### A. Hostile work environment

■ Title VII prohibits employers from discriminating in the hiring, discharge, or the setting of "compensation, terms, conditions, or privileges of employment" because of an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). Harassment motivated by plaintiff's race, sex, or other protected status is actionable under Title VII if it results in a hostile or abusive work environment, *see Evans,* 29 F.Supp.2d at 206 n. 9 (citing *Harris,* 510 U.S. at 21, 114 S.Ct. 367), regardless of whether plaintiff has lost tangible job benefits. *See Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992). In determining whether plaintiff has sufficiently

alleged a hostile work environment claim, the court must consider a number of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998) (citation and quotation marks omitted). These factors must be evaluated from both a reasonable person's standpoint as well as from the plaintiff's subjective perception. *See id.* As a general matter, "'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.'" *Quinn,* 159 F.3d at 768 (quoting *Tomka,* 66 F.3d at 1305 n. 5). However, a single incident can create a hostile environment if the conduct is sufficiently severe, as in the case of sexual assault. *See id.* at 768. Ultimately, whether a workplace should be viewed as hostile or abusive depends on the totality of the circumstances. *See Kotcher,* 957 F.2d at 63.

■ As previously mentioned in the continuing violation discussion, Meckenberg has failed to allege a hostile environment claim based on acts prior to October 7, 1994. For similar reasons, she has also failed to demonstrate a hostile environment claim for acts after that date. Meritorious hostile environment claims have depended upon the "existence of a 'poisoned' atmosphere, where the individual is required to run 'a gauntlet of [discriminatory] abuse in return for the privilege of being allowed to work.'" *Christoforou,* 668 F.Supp. at 301 (citations omitted). The harassment alleged by Meckenberg simply fails to rise to the level of severity or pervasiveness necessary for a successful hostile environment claim. Indeed, she has failed to present any comments, or "intimidation, ridicule, [or] insult," *see Harris,* 510 U.S. at 21, 114 S.Ct. 367,

within the limitations period that can be attributed to a discriminatory animus. *See Evans*, 29 F.Supp.2d at 206 n. 9 (granting employer's summary judgment motion on hostile environment claim where plaintiff failed to present evidence that harassment was motivated by race or color). *See also Gutierrez v. Henoch*, 998 F.Supp. 329, 335 (S.D.N.Y.1998) (Pollack, J.) (noting that disputes over job-related disagreements or personality conflicts are not evidence of wrongful conduct).

## B. Loss of tangible job benefits

Meckenberg's second claim under Title VII is that she suffered from the loss of tangible job benefits on account of her race and gender in the form of: 1) unequal pay when compared to similarly situated male employees; and 2) failing to receive promotions or requested transfers.

When considering claims alleging discriminatory employment practices in "single issue motivation" cases,[6] courts employ the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Under the *McDonnell Douglas* analysis, the plaintiff must initially prove by a preponderance of the evidence a prima facie case of discrimination. *See Dister*, 859 F.2d at 1112. Proof of a prima facie case creates a presumption that the employer discriminated against the employee in an unlawful manner, *see id.* at 1112, and plaintiff's burden at this stage is de minimis. *See Fisher v. Vassar College*, 114 F.3d 1332, 1340 n. 7 (2d Cir.1997) (collecting cases). Once the plaintiff meets his de minimis burden, the burden of production shifts to the defendants who must articulate a legitimate, nondiscriminatory reason for their actions. *See Chambers*, 43 F.3d at 38; *Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir.1994). The defendants need not persuade the court that they were actually motivated by the proffered reason to meet their burden, *see Dister*, 859 F.2d at 1112, but if the defendants are successful in meeting their burden, the presumption of discrimination drops out of the case. *See Gallo*, 22 F.3d at 1224–25. The burden then rests on the plaintiff to persuade the trier of fact that, more likely than not, the true reason was intentional discrimination. *See Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997).

---

**6.** Title VII cases can be divided into two types of cases, often referred to as "single issue motivation" and "dual motivation" cases. *See Cartagena v. Ogden Services Corp.*, 995 F.Supp. 459, 461 (S.D.N.Y.1998) (Sotomayor, J.). In single issue motivation cases, the "fact-finder decides only the single issue of whether an impermissible reason was a substantial motivation of the adverse employment action ...." *Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 223 (2d Cir.1997). In dual motivation cases, the "employee acknowledges the existence of a permissible factor ... that might have contributed to the employer's motivation, but contends that an impermissible factor was also a substantial component of the motivation." *Id.* In such cases, the fact-finder is charged with the "additional issue of whether the defendant has proved that it would have taken the same action for a permissible reason." *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997).

In single issue motivation cases, the court employs the familiar *McDonnell Douglas* burden-shifting analysis. In dual issue motivation cases, however, "a plaintiff must initially proffer evidence that an impermissible criterion was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Services*, 82 F.3d 16, 23 (2d Cir.1996) (citations omitted) (emphasis in original). This initial burden is greater than the level of proof necessary to make out a prima facie case in a single issue motivation case. *See id.* Once a plaintiff has offered "direct" evidence of discrimination, "the burden shifts to the employer to demonstrate that it would have reached the same decision even in the absence of the impermissible factor." *Id.* As both sides have proceeded only under the "single issue motivation" theory, the court will do the same.

376

In order to make out a prima facie case of employment discrimination, the plaintiff must demonstrate: (1) that she belongs to a protected class; (2) that she was qualified for the position; (3) that she was subject to an adverse employment action; and 4) that the adverse employment decision occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir.1998) (collecting cases).

### a. Discriminatory pay

 Meckenberg alleges that the pay discrimination began once she was promoted to Principal Racing Data Coordinator, pursuant to the 1990 Conciliation Agreement. Meckenberg claims that OTB discriminated against her by: 1) offering her a lower salary than the minimum base pay for a manager during the negotiation of the Conciliation Agreement; and 2) continuing to pay her less than other managers at OPCEN by not giving her full management raises. This pay discrimination resulted in Meckenberg receiving less pay than other managers at OPCEN and, in one case, less pay than a subordinate.

The court finds that Meckenberg has failed to adduce evidence that would persuade a reasonable factfinder that she was subject to pay discrimination.[7] With regard to Meckenberg's contention that she was not offered the minimum starting pay for a manager, her claim is fatally undercut by her own testimony that she was placed in the "original jurisdiction subdivision of management that's not quite full management pay plan," which was "not union, collective bargaining." (Meckenberg Dep. at 70). As Meckenberg has not shown, or even alleged, that she was entitled to placement in the full management pay plan upon receiving her promotion or that OTB misled her into believing that she was, the court is hard pressed to find evidence giving rise to the inference that she was discriminated against. Indeed, she testifies that she was later placed in the full management pay plan once her salary reached the $33,000 plateau. (Meckenberg Dep. at 98).

Meckenberg's testimony regarding the pay raises she allegedly failed to receive also belies her discrimination claim. Meckenberg's claim appears to rest on the fact that she didn't receive the same raises as the "collective bargaining" personnel during 1991 to 1995. However, she fails to state why she was entitled to or qualified to receive those raises. Rather, she admits that she was given the raises accorded to "original jurisdiction" employees (which included other track units managers) during that time period (Meckenberg Dep. at 71), and that when she was upgraded to the full management pay plan, she received raises in accordance with other managers at OPCEN. (Meckenberg Dep. at 103). While she alleges that she received the "minimum percentage" raise, Meckenberg cannot name anyone who received a higher percentage than she did, or even state a reason for believing that other managers had received a larger raise. Meckenberg also contends that she was not informed that she had been placed in the full management pay plan until a year after the fact, and that OTB discriminatorily denied her a retroactive raise for that year. However, she fails to allege with any degree of specificity what raises she missed, if any.[8] Thus, assuming that Ciril-

---

7. Defendants argue that Meckenberg's pay discrimination claims are barred because they were settled as part of the Conciliation Agreement or, in the alternative, because they are untimely. However, as noted in the court's discussion of the continuing violations doctrine, the receipt of each paycheck is a separate cause of action. *See Pollis*, 132 F.3d at 119. Under this principle, Meckenberg is barred from recovery based on paychecks received before October 7, 1994, but not those received after that date, assuming she proves intentional discrimination.

8. According to Meckenberg, managers did not receive raises regularly. Instead, raises were conferred by the City of New York on a sporadic basis. (Meckenberg Dep. at 111). Thus, a reasonable factfinder could not infer that Meckenberg necessarily missed a man-

lo did indeed state that Meckenberg would never receive a raise at OTB, the court nevertheless finds that Meckenberg has failed to state a prima facie case of pay discrimination as her own testimony makes it clear that she did receive the appropriate raises throughout her employment at OTB. To the extent that Meckenberg bases her discrimination claim on the allegation that she received fewer or smaller raises than male managers at OPCEN, the court finds those allegations to be speculative and insufficient to raise a triable issue of fact. *See Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (noting that a party may not rely on "mere conjecture or speculation" to overcome a motion for summary judgment). Furthermore, to the extent that Meckenberg rests her discrimination claim on the mere fact that male managers at OPCEN received higher pay than she did, her claim must still be dismissed because her own testimony demonstrates that she was not similarly situated to those managers with respect to seniority or job description.[9] *See Montana v. First Federal Savings and Loan Assoc.*, 869 F.2d 100, 106 (2d Cir.1989) (requiring plaintiff to show, inter alia, that she was treated less favorably than "comparable male employees" in order to establish a prima facie case of discrimination).

### b. Failure to promote or transfer [10]

Meckenberg alleges that she was discriminatorily denied transfer or promotion on different occasions in 1995. In March, 1995, she applied for the position of Senior Buyer; on June 26, 1995, she requested a transfer to the Telephone Betting, Intergovernmental Affairs, or Media Relations department; and, sometime in late June, 1995, she submitted a written request to Sherman for transfer outside of OPCEN. Meckenberg was eventually transferred to the Customer Service Department in September, 1995, but argues that the previous transfer denials constitute discrimination actionable under Title VII. In response, defendants contend that the transfer denials were not "adverse employment actions" under Title VII because the denials did not materially affect the "compensation, terms, conditions, or privileges" of Meckenberg's employment. Furthermore, defendants note that even if a denial for transfer is an adverse action, Meckenberg was indeed transferred to the Customer Service Department. Thus, argue defendants, Meckenberg was not subject to an adverse action because her transfer request was eventually granted.

Protections provided by Title VII are not limited to discriminatory discharge, *see Dortz v. City of New York*, 904 F.Supp. 127, 156 (S.D.N.Y.1995) (Leisure, J.), nor to " 'instances of discrimination in pecuniary emoluments,' " *de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Services*, 82 F.3d 16, 23 (2d Cir.1996) (quoting *Rodriguez v. Board of Educ.*, 620 F.2d 362, 366 (2d Cir.1980)). Adverse actions include a decision that "has an attendant negative result, a deprivation of a position or an opportunity." *Medwid v. Baker*, 752 F.Supp. 125, 136–37

---

agement pay raise because of OTB's failure to give her a retroactive salary increase once she learned that she had been placed on the full management pay plan.

9. The three OPCEN managers in 1993 that received higher pay than plaintiff were computer managers, and did not have the same job responsibilities as Meckenberg. (Meckenberg Dep. at 105–06). Furthermore, two of those managers had been management at OTB for 20 years longer than Meckenberg. (Meckenberg Dep. at 105). Similarly, the two managers that did have the same job title as Meckenberg had more experience as manag-

ers at OTB than plaintiff; in one case, more than 20 years of experience. (Meckenberg Dep. at 110). The subordinate who received higher pay than Meckenberg had received raises due to his status as a "collective bargaining" employee. (Meckenberg Dep. at 104).

10. Meckenberg also claims that she was denied transfer requests in July, 1995 after her telephone call to Mayor Giuliani. The court will consider these denials as part of her retaliation claim.

(S.D.N.Y.1990) (Ward, J.). Thus, it has been held that transfers resulting in a diminution of duties, *see Sprott v. Franco,* 1997 WL 79813, *14 (S.D.N.Y. Feb.25, 1997) (Leisure, J.), or a loss of prestige and opportunity for advancement, *see de la Cruz,* 82 F.3d at 21, are actionable under Title VII. On the other hand, " 'not every unpleasant matter short of [discharge or demotion]' " constitutes an adverse employment action. *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997) (quoting *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.1994)). *See also Garber v. New York City Police Dep't,* 1997 WL 525396, *6 (S.D.N.Y. Aug.22, 1997) (Keenan, J.) (holding that plaintiff's purely subjective feelings did not negatively alter terms and conditions of employment), *aff'd,* 159 F.3d 1346 (2d Cir.1998).

After carefully reviewing the record, the court finds that Meckenberg has stated a legally cognizable adverse employment action. While an employee's subjective dissatisfaction does not necessarily render an employment action adverse, Meckenberg has created a material issue of fact with regard to her claim that the working conditions within OPCEN were objectively unfavorable due to the shortage in staff. Accordingly, the denial of a request for transfer to departments where conditions were more favorable constitutes an adverse action. *See Bunis v. Runyon,* 1997 WL 639241, *3 (S.D.N.Y. Oct.16, 1997) (Keenan, J.) (defining adverse action as disparity in "opportunities, benefits, pay, prestige or working conditions."). Furthermore, while defendants argue that the fact that Meckenberg was eventually transferred essentially rectifies her previous requests, each denial resulted in distinct missed opportunities at OTB, in addition to a prolonged stay within OPCEN. Each denial therefore constitutes an adverse action, regardless of the fact that plaintiff was eventually transferred.

Contrary to defendants' contention, the court's holding on this issue will not "invest employees with a right to immediate transfer to any position they choose, regardless of employer staffing needs, or vacancies." (Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. at 23). Plaintiff must still satisfy the other components of her prima facie case, including demonstrating that she was qualified for the position and that the adverse employment decision occurred in circumstances giving rise to an inference of discrimination. It is Meckenberg's failure to meet these essential elements that requires dismissal of her claim that she was denied the transfer requests for discriminatory reasons.

 With regard to her application for the Senior Buyer position, Meckenberg has not adduced any evidence showing that she was qualified for the job besides her conclusory statement that her experience working within OTB gave her the ability to perform the job. (Meckenberg Dep. at 118). Indeed, she admits that she had no direct experience, and that she "probably" wasn't the most qualified on paper. (Meckenberg Dep. at 120). She claims instead that inexperience hadn't "stopped people from getting positions in the past," although she failed to name any employees who received positions under those circumstances. (Meckenberg Dep. at 120–21). Such statements on their own are insufficient to establish that plaintiff was qualified for the position she sought, and accordingly, the court finds that she has failed to meet an essential prong of her prima facie case. *See also Ortega v. New York City Off–Track Betting Corp.,* 1998 WL 355416, *5 (S.D.N.Y. July 1, 1998) (Wood, J.) (holding vague and conclusory statements insufficient to establish requirement that plaintiff demonstrate that she was qualified for the position).

 With regard to her other transfer requests, Meckenberg has failed to adduce evidence that the denials occurred in circumstances that give rise to an inference of discrimination. Although she claims that Romano had "totally blocked" her efforts for transfer, Meckenberg has not alleged any comments or actions by Romano

that indicate a discriminatory animus or motivation, nor any statements by Romano that were even related to her race or gender. *See also Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir.1997) (noting employee's failure to recall any statement showing discriminatory animus in affirming dismissal of complaint). As discussed in Part II.A., *supra*, Meckenberg's own testimony leads to the conclusion that the difficulties she experienced with Romano were a product of their personality differences, and not discriminatory animus on Romano's part.[11]

 Even if the court were to find that Meckenberg had made her prima facie case, she has failed to satisfy her burden of showing that defendants' articulated nondiscriminatory reasons for denying her requests were pretextual. With regard to the Senior Buyer position, Meckenberg has not submitted any evidence suggesting that OTB's contemporaneous explanation for denying her application—that she was not qualified—is a pretext for discrimination. With regard to the other transfer requests, Meckenberg claims that inconsistencies in defendants' proffered reasons for the denials demonstrate pretext. Specifically, she notes that Romano told her that he wasn't going to allow her to transfer because she was a critical and valuable member of the racing operations staff, yet reprimanded her for making a mistake on an occasion when she was ill. (Meckenberg Dep. at 122, 164). Meckenberg also questions Romano's assertion that she was a critical member of the staff and difficult to replace. (Meckenberg Dep. at 122–23). Although Meckenberg argues that these inconsistencies demonstrate that the real reason behind the denials was discrimination, her argument is ultimately unpersuasive. In drawing this conclusion, the court is mindful of the proposition that summary judgment is generally inappropriate when an employer's intent, motivation, or state of mind is at issue. Nonetheless, "[i]t is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal." *Dister*, 859 F.2d at 1116. Thus, while it may have been ill-advised for defendants to keep plaintiff in a position where she was clearly unhappy, there is no evidence, direct or circumstantial, indicating that the proffered reasons are untruthful. Moreover, the inconsistencies cited by Meckenberg are minor at best and are insufficient by themselves to create a triable issue of fact.

## C. Retaliation

██ Title VII prohibits an employer from subjecting an employee to adverse employment action in retaliation for that employee's opposition to allegedly discriminatory employment practices. *See* 42 U.S.C. § 2000e–3(a). When plaintiff relies on indirect evidence of retaliation, courts employ the previously discussed *McDonnell Douglas* burden shifting analysis. *See Quinn*, 159 F.3d at 768. In order to establish a prima facie case of retaliation, a plaintiff must demonstrate: "i) participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff; and iii) a causal connection between the protected activity and the adverse employment action." *Tomka*, 66 F.3d at 1308. With respect to the first element, "plaintiff need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a 'good faith, reasonable belief that the underlying employment practice was unlawful' under that statute." *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d

11. While evidence of sexual stereotyping, such as Cirillo's comment to Meckenberg that certain departments at OTB were "no place for a woman," might in other circumstances create an inference of discrimination, *see Galdieri–Ambrosini v. National Realty & Dev.* *Corp.*, 136 F.3d 276, 289 (2d Cir.1998), Meckenberg has not alleged that Cirillo had any role in the decisions to deny her transfer requests. Indeed, Cirillo was no longer an employee of OTB by 1995. (Meckenberg Dep. at 194).

1170, 1178 (2d Cir.1996)). Whether plaintiff's belief is reasonable depends on the totality of the circumstances. *See id.*

Meckenberg alleges that defendants retaliated against her for her telephone call to a radio show hosted by Mayor Giuliani, and for her subsequent filing of a Charge of Discrimination with the EEOC.[12] The alleged retaliatory acts included: 1) the removal of posters from her cubicle; 2) increased supervision by Romano and being required to account for "every minute" of her day; 3) being prohibited from using the telephone for personal calls; 4) the reneging of a promise to transfer her out of OPCEN; 5) Romano's questioning of the veracity of a doctor's note and subsequent threat to deny her vacation days; 6) Romano's refusal to double-check her work which caused her to make a mistake for which she later received a reprimand; 7) Sherman's failure to fulfill his promise that he would hire additional staff for OPCEN; 8) the withholding of her paycheck for about an hour; and 9) being asked to drop her EEOC charge on two occasions.

■ Defendants contend that Meckenberg has failed to meet all three prongs of her prima facie case. First, defendants argue that she has failed to demonstrate that she had a good faith, reasonable belief that defendants' conduct was unlawful. The court is mindful that the determination of whether plaintiff's belief was reasonable and made in good faith depends in part on an assessment of plaintiff's legal sophistication. *See Barcher v. New York Univ. Sch. of Law,* 993 F.Supp. 177, 185 (S.D.N.Y.1998) (Leisure, J.). Therefore, "a good faith mistake, whether of fact or law, regarding the legality of the employer's conduct will not strip the plaintiff of Title VII protection against retaliation." *Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 410 (S.D.N.Y.1996) (Francis, M.J.) (citation omitted).

■ While Meckenberg's allegations of hostile work environment and employment discrimination cannot survive defendants' summary judgment motion, the court nevertheless finds that she has created a material fact as to whether she had a good faith, reasonable belief that defendants' conduct was unlawful. The alleged comments by Cirillo indicating that he thought Meckenberg was a "bitch" and that some departments were "no place for a woman" were made early in plaintiff's tenure, and could have reasonably colored her interpretation of the subsequent treatment she received by Romano, Palumbo, and others at OTB. Relying on such evidence, a reasonable factfinder could find that Meckenberg had a good faith, reasonable belief that defendants' actions were discriminatory.

■ Next, the defendants argue that none of the allegedly retaliatory acts constitutes adverse employment action. The court agrees with defendants with respect to some of the alleged acts.[13] How-

---

12. Meckenberg also suggests that she was retaliated against for filing the claim of discrimination with the New York State Division of Human Rights that led to the 1990 Conciliation Agreement. The court finds, however, that this claim must be dismissed on the grounds that the retaliatory acts alleged—including staff resentment, the failures to promote, and the discriminatory pay—are not only time-barred in some instances, but are also ascribed to non-retaliatory and nondiscriminatory motivations in plaintiff's own testimony, as discussed in Part II.A., *supra.*

13. The following actions are not, as a matter of law, adverse: 1) the one hour delay caused by the withholding of Meckenberg's paycheck; 2) being asked to drop her EEOC charge; 3) the telephone use restrictions; 4) being questioned by Romano about her illness and his threat to withhold her annual vacation days; and 5) Romano's refusal to double-check her work which caused her to make a mistake for which she later received a reprimand. First, the delay in receiving her paycheck, which was less than one hour long, simply did not affect the compensation, terms, privileges, or conditions of her employment. *See also Sprott v. Franco,* 1997 WL 79813, *13 n. 5 (S.D.N.Y. Feb.25, 1997) (Leisure, J.) (delay in receiving paycheck was "mere inconvenience" and did not constitute adverse employment action).

ever, a reasonable finder of fact could conclude that the other acts alleged were adverse employment actions. As discussed in Part III.B.b., *supra*, each denial of a transfer request is an adverse employment action. Moreover, the sudden removal of the posters from her cubicle and the increased supervision by Romano could constitute adverse action if the acts created unreasonable working conditions. *See Dominic v. Consol. Edison Co.*, 822 F.2d 1249, 1254–55 (2d Cir.1987) (noting that retaliation could occur in the form of direct and heavy-handed supervision); *Dortz*, 904 F.Supp. at 156 (noting that increased supervision could disadvantage and interfere with employee's ability to perform her job and thus could constitute adverse action). Similarly, Sherman's failure to respond to Meckenberg's request for additional staff in the face of increasing responsibilities within OPCEN could have been part of defendants' effort to "make [plaintiff's] life so miserable downstairs that [she] would be forced to quit if [she] didn't back off," as Palumbo allegedly threatened. These are questions of fact that cannot be resolved on a motion for summary judgment.

 Defendants also argue that there is no evidence of a causal connection between the protected activity and the adverse employment action. A causal connection between the adverse action and the

---

With respect to the requests that she drop her EEOC charge, the Second Circuit has stated that "[i]t is conceivable that a demand to withdraw an EEOC charge could constitute retaliation, if it truly had so great an effect on the plaintiff as to alter the conditions of her employment in a material way." *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997). For example, "repeated and forceful demands accompanied even by veiled suggestions that failure to comply would lead to termination, discipline, unpleasant assignments or the like, might in some circumstances affect an employee's working conditions." *Id.* In the instant case, Meckenberg has not alleged that OTB's two requests were "forceful" or were accompanied by veiled threats. Rather, the requests were accompanied by inquiries as to what working conditions Meckenberg desired, and ultimately led to Meckenberg receiving a transfer out of OPCEN. Thus, Meckenberg suffered no negative consequences for refusing OTB's requests; in fact, she received an improvement in the conditions of her employment.

Regarding the telephone use restrictions, the court notes that the ban on the use of the telephone for personal reasons was an OTB official policy. Furthermore, the ban is tangential if not irrelevant to Meckenberg's ability to perform her job, and constitutes a mere inconvenience that is not an adverse employment action. Furthermore, Meckenberg's own testimony belies her claim that the action was motivated by a desire to retaliate. In her deposition, Meckenberg attributes the restrictions to a non-retaliatory reason: the abuse of the telephone for personal calls by Mike Sullivan, an OTB employee. (Meckenberg Dep. at 162–63). She notes that Sullivan had been fired in part because of his use of the telephone for personal reasons, and claims that she was "being made to pay" for Sullivan's actions. (Meckenberg Dep. at 162). Given that OTB outright terminated an employee for violating the policy, it is altogether unlikely that a reasonable factfinder would find that OTB's enforcement of the telephone policy on Meckenberg was motivated by retaliation.

Meckenberg also claims that Romano became angry with her after she presented a doctor's note stating that she could not work more than 35 hours per week without a day off. While Romano accommodated this medical necessity, plaintiff alleges that he threatened to withhold her annual vacation days. However, as Romano never in fact withheld her vacation days, Meckenberg did not suffer any consequences from that threat. Thus, the threat does not constitute an adverse action. *See also Henriquez v. Times Herald Record*, 1997 WL 732444, *6 (S.D.N.Y. Nov.25, 1997) (Stein, J.) (holding employee's allegations of unfair criticism of her performance, threats of disciplinary action, and being required to provide medical documentation during leave of absence did not constitute adverse employment action).

Lastly, the reprimand, whether or not it was justifiable, was not an adverse action because Meckenberg has not alleged that the reprimand affected the compensation, promotion opportunities, or any other term, privilege, or condition of her employment. *See also Johnson v. Frank*, 828 F.Supp. 1143, 1153 (S.D.N.Y.1993) (Motley, J.) (negative evaluation that did not affect terms, privileges, duration, or condition of employment was not adverse action); *Payne v. State of New York Power Author.*, 997 F.Supp. 492, 500 (S.D.N.Y.1998) (Cedarbaum, J.) (same).

382

protected activity can be established indirectly by showing that the adverse treatment occurred in close temporal proximity to the protected activity, or directly through evidence of retaliatory animus directed against plaintiff. *See Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir.1990). In the instant case, the court finds that Meckenberg has tendered both indirect and direct evidence sufficient to establish a causal connection between her phone call to Mayor Giuliani and the adverse action discussed above. The adverse acts alleged by Meckenberg, including Romano's sudden removal of the posters that had been on her walls for 15 years, occurred in the two months between her call and her transfer out of OPCEN. This close temporal proximity between the call and the adverse acts is sufficient circumstantial evidence of causation. *See, e.g., Quinn*, 159 F.3d at 769 (discharge that occurred less than two months after employee filed complaint with management and ten days after she filed complaint with New York Division of Human Rights constituted proof of causal connection); *Dortz*, 904 F.Supp. at 156–57 (negative evaluation proof of causation where employee had never received a negative evaluation prior to complaint).

The court further finds that Palumbo's remarks to Meckenberg that her complaint "might not have been the brightest thing to do if one wanted to advance" and that he would "make [her] life so miserable downstairs that [she] would be forced to quit if [she] didn't back off" as circumstantial, if not direct, evidence of retaliatory animus. While defendants argue that Palumbo's remarks should not be considered because Meckenberg cannot connect the retaliatory acts directly to Palumbo, there is evidence that Palumbo played a role in denying her request for a transfer. Furthermore, there is also evidence that Palumbo, Romano, and Sherman occasionally consulted each other with regard to Meckenberg's employment situation. It is possible then that Palumbo could have directed, or played a part in, the retaliatory acts

committed against Meckenberg by Romano or Sherman. Therefore, his remarks are relevant to Meckenberg's retaliation claim.

Defendants also contend that there is no causal nexus between the adverse acts and Meckenberg's call to Mayor Giuliani because she had made similar complaints about being harassed before the call. However, the court finds that plaintiff has adduced evidence suggesting that the harassment became more egregious after the call. For instance, Meckenberg contends that after her call to Mayor Giuliani, Romano "made me account for my whereabouts throughout the day. I had to account for every minute where I was, tell somebody where I was . . . ." (Meckenberg Dep. at 153). Thus, while Meckenberg alleges that she was harassed by Romano before the call, there is sufficient evidence for a jury to infer that the call triggered more severe treatment. *See also Dortz*, 904 F.Supp. at 157 (employee's complaints of exclusion, isolation, and harassment before she engaged in protected activity did not break causal nexus in retaliation claim where there was evidence that adverse treatment became more severe).

Plaintiff having made her prima facie case of retaliation, the burden now shifts to defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. With respect to Romano's actions, defendants contend that he had a legitimate reason to suspect Meckenberg had abused time privileges in the past. Defendants also point out that as a manager, Meckenberg was reasonably held to high standards of compliance with OTB rules. With respect to the transfer denials and the reneging of the promise by Sherman for additional staff within OPCEN, defendants argue that those decisions were motivated by the legitimate business concerns of OTB. The court finds that defendants have successfully met their burden.

The burden now shifts to plaintiff to demonstrate that the nondiscriminatory

reasons articulated by defendants are merely a pretext for retaliation by "the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' or by reliance on the evidence comprising the prima facie case, without more." *Chambers*, 43 F.3d at 38 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). While the plaintiff is not required to show that the employer's reason was pretextual in order to prevail, *see Fields*, 115 F.3d at 121, "[t]he factfinder's disbelief of the reasons put forward by the defendant[s] (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show [retaliation]." *St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742. However, while rejection of the employer's proffered reason will permit the trier of fact to infer the ultimate fact of retaliation without additional proof, it does not compel judgment for the plaintiff. *See id.* The burden of persuading the trier of fact of retaliation remains at all times on the plaintiff. *See Sumner*, 899 F.2d at 209.

Based on the allegations regarding Palumbo's comments and the close temporal proximity of the adverse employment acts, the court finds that Meckenberg has proffered sufficient evidence suggesting that defendants' articulated reasons are pretextual. In making this determination, the court is mindful of two propositions. The first is that Title VII is violated if the retaliatory motive played a part in the adverse action even if it was not the sole cause. *See Sumner*, 899 F.2d at 209. The second proposition is that in determining a summary judgment motion, "the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact," *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995) (collecting cases), and must draw all factual inferences in favor of the non-moving party, viewing the factual assertions in the affidavits, depositions, and exhibits in the light most favorable to the non-moving party. *See id.* While defendants' articulated reasons for the adverse actions are nondiscriminatory on the surface, a reasonable jury could nevertheless infer that the real reason for the acts was retaliation. Summary judgment, therefore, is improper.

## IV. Section 1983

 Meckenberg has also alleged a § 1983 violation for deprivation of her rights under the Equal Protection Clause of the Fourteenth Amendment. Section 1983 provides a civil cause of action against any person who under color of law deprives another of federal rights created by the Constitution. *See Annis v. County of Westchester*, 36 F.3d 251, 253–54 (2d Cir.1994).

 Meckenberg asserts that the defendants violated her right under the Equal Protection Clause to be free from improper sexual conduct that creates a hostile work environment.[14] *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 143–44 (2d Cir.1993); *Annis*, 36 F.3d at 254 (holding that harassment that "transcends coarse, hostile and boorish behavior can rise to the level of a constitutional tort."). In the Second Circuit, "a § 1983 claim is not precluded by a concurrent Title VII claim, when the former is based on substantive rights distinct from Title VII." *Saulpaugh*, 4 F.3d at 143 (citation and internal quotation marks omitted). *See also Burrell v. City Univ. of New York*, 995 F.Supp. 398, 413 (S.D.N.Y.1998) (Sweet, J.) ("The fact that [plaintiff's] § 1983 claims are founded on the same factual allegations as those underlying her

**14.** Discrimination actions under Title VII and § 1983 are generally composed of the same elements, and are assessed through the same legal framework. *See Shafa v. Montgomery Ward & Co.*, 699 F.Supp. 465, 469 n. 1 (S.D.N.Y.1988) (Leisure, J.) (citing *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 44 (2d Cir.1984)).

Title VII claim does not prevent concurrent pleading."). However, as Meckenberg has not proffered facts that would lead a reasonable factfinder to conclude that she was subject to a hostile work environment at any time during her career at OTB, her claim is dismissed.[15]

## V. State law claims

 In addition to her claims under Title VII and 42 U.S.C. § 1983, Meckenberg asserts a breach of contract and an intentional infliction of emotional distress claim against the defendants. Both claims are easily dismissed. With respect to the breach of contract claim, Meckenberg claims that defendants violated the 1990 Conciliation Agreement which prohibits defendants from retaliating against her for bringing that complaint. For the reasons discussed in Part II.A. and n. 12, *supra*, the court finds that Meckenberg's retaliation claim based on the 1990 complaint under either Title VII or a breach of contract theory cannot survive defendants' motion for summary judgment.

 In order to sustain a claim for intentional infliction of emotional distress, the plaintiff must establish the following four elements: 1) extreme and outrageous conduct on the part of the defendants, 2) intent on the part of the defendants to cause, or disregard of a substantial probability of causing, severe emotional distress, 3) a causal connection between defendants' conduct and the injury suffered, and 4) severe emotional distress suffered by plaintiff. *See Forbes v. Merrill Lynch*, 957 F.Supp. 450, 456 (S.D.N.Y.1997) (Motley, J.). To prove the first element, the conduct must be " 'so outrageous in character,

and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Id.* (quoting *Wolff v. City of New York Financial Services Agency*, 939 F.Supp. 258, 263 (S.D.N.Y.1996) (Motley, J.)). Meckenberg's allegations simply do not rise to the level required under this strict test.

 Even were the court to find that Meckenberg's state claims had substantive weight sufficient to defeat summary judgment, the claims are nevertheless barred due to her failure to serve OTB with a notice of claim as required under § 618 and § 619(6) of the N.Y. Rac., Pari–Mut. Wag. and Breed. Law. Under § 618 and § 619(6), a plaintiff seeking to maintain an action "for damages" against OTB or an employee of OTB must file a notice of claim or her claims will be dismissed. *See also Kelly v. New York City Off–Track Betting*, 1991 WL 51067, *4 (S.D.N.Y. April 2, 1991) (Martin, J.); *McNeil v. Aguilos*, 831 F.Supp. 1079, 1085 (S.D.N.Y. 1993) (Sotomayor, J.) (compliance with state notice of claim requirements condition precedent to tort action). Meckenberg argues that the inclusion of state claims in a plaintiff's complaint with the New York State Division of Human Rights ("NYSHDR") or charge with the EEOC may serve as notice under § 618. However, § 618 specifies a particular form of notice and manner of service. These requirements are not satisfied by the inclusion of state claims in either a NYSDHR complaint or an EEOC charge. *See, e.g., McNeil*, 831 F.Supp. at 1085 n. 5 (particular state notice requirements not fulfilled by EEOC filing). While a plaintiff may be given permission to file a late notice of

**15.** Meckenberg has not specifically alleged a § 1983 claim on the basis of defendants' retaliation against her for engaging in Title VII protected activities. Nevertheless, to the extent that her § 1983 claim is based on this theory, the court notes that employer retaliation for an employee's charge or lawsuit under Title VII is a violation of Title VII. Meckenberg's retaliation claim, therefore, is not based on a distinct violation of a constitution-

al right, and not actionable under § 1983. *See Moche v. City University of New York*, 781 F.Supp. 160, 168 (E.D.N.Y.1992), *aff'd without opinion*, 999 F.2d 538 (2d Cir.1993); *Igielnik v. NYC Human Resources Admin.*, 1996 WL 137303, *3 (S.D.N.Y.1996) (Baer, J.); *Valdes v. New York City Dep't of Envtl. Protection*, 1997 WL 666279, *4 n. 3 (S.D.N.Y. Oct.27, 1997) (Rakoff, J.).

claim pursuant to N.Y.Gen.Mun.Law § 50–e(5), such discretion is within the exclusive province of state courts. *See Kelly,* 1991 WL 51067 at *4 (citing *Brown v. Metro. Transp. Auth.,* 717 F.Supp. 257, 259 (S.D.N.Y.1989) (Sand, J.)).

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is denied for plaintiff's Title VII claim alleging that she was retaliated against for her June 28, 1995 call to Mayor Giuliani and her August 2, 1995 filing with the EEOC. Summary judgment for defendants is granted on plaintiff's remaining federal and state claims. Furthermore, all claims against Dukes, Romano, and Palumbo are dismissed as individuals are not liable in their personal nor official capacity under Title VII. Parties are to submit a revised Joint Pretrial Order, consistent with this decision, by May 7, 1999.

**IT IS SO ORDERED.**